UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **DAKOTA PIETSCH,** | § |
| | § |
| *Plaintiff*, | § |
| | § |
| v. | § CIVIL ACTION NO.: 4:23-CV-01584 |
| | § |
| **FMC TECHNOLOGIES, INC. d/b/a,** | § JURY DEMANDED |
| **TECHNIP FMC,** | § |
| | § |
| *Defendant*. | § |

**DAKOTA PIETSCH'S RESPONSE TO FMC TECHNOLOGIES, INC'S MOTION
<u>FOR SUMMARY JUDGMENT</u>**

# **TABLE OF CONTENTS**

I. BACKGROUND ...............................................................................................................1

II. STANDARD OF REVIEW..............................................................................................2

III. ARGUMENT AND AUTHORITIES ..............................................................................3

    1. Mr. Pietsch is "disabled" under the ADA ................................................................4

    2. Mr. Pietsch's heart condition is a disability under the ADA as it relates to the COVID shot ..............................................................................................................6

    3. Mr. Pietsch has a qualifying disability under the ADA ...........................................7

    4. Defendant failed to provide Mr. Pietsch a reasonable accommodation.................11

        a. Frac Flowback Supervisor ...........................................................................11

        b. High bay and/or low bay tech .....................................................................11

        c. Machinist......................................................................................................11

    5. Many positions were available that Mr. Pietsch was qualified for and did not require the employee to be vaccinated. Defendant refused to send Mr. Pietsch to these jobs while allowing other unvaccinated employees to take the jobs............12

    6. Defendant made an "adverse employment decision" against Mr. Pietsch because of his disability.......................................................................................................13

IV. CONCLUSION ...............................................................................................................13

I. **BACKGROUND**

Plaintiff Dakota Pietsch ("Mr. Pietsch") files this his response to Defendant FMC Technologies, Inc. ("Defendant") Motion for Summary Judgment.

On November 9, 2021, Defendant issued a policy requiring its employees to take the COVID-19 shot as a condition for employment.[1] On December 15, 2021, Mr. Pietsch timely submitted his request for a medical exemption from the mandatory vaccination policy due to a heart condition.[2] The exemption included a "Medical Provider Statement" signed by Mr. Pietsch's physician.[3] Due to his heart condition, Mr. Pietsch's physician advised him not to take the COVID-19 shot. His doctor completed the Medical Provider Statement.[4]

On December 16, 2021, Defendant informed Mr. Pietsch that his request for a medical exemption had been "reviewed and approved."[5] Defendant then informed Mr. Pietsch that it would "engage in the interactive process to determine a reasonable accommodation."[6] The Defendant informed Mr. Pietsch that he would "not be able to remain in…[] his current position…."[7] and be unable to continue in his then-current position of Subsea Technical Services Personnel. Mr. Pietsch was then placed on leave with minimum pay and not allowed to work on jobs that would have allowed him to earn the same compensation he received prior to the implementation of the COVID-19 policy. Defendant indicated that Mr. Pietsch would be "able to continue to seek other positions within the company through the end of January 2022."[8]

---

[1] Ex. A
[2] Ex. B
[3] Id.
[4] Id.
[5] Ex. C
[6] Id.
[7] Id.
[8] Id.

1

After granting Mr. Pietsch's request for a medical exemption, Defendant did not allow Mr. Pietsch to work and significantly reduced his compensation. Defendant failed to provide Mr. Pietsch a reasonable accommodation.

In April 2022, Mr. Pietsch was forced to resign from his employment with Defendantdue to the significant reduction in take-home pay. After granting his request for a medical exemption, Defendant failed to provide a reasonable accommodation in violation of the Americans with Disabilities Act, 42 U.S.C. § 12111-12117 (the "ADA").

## II. STANDARD OF REVIEW

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A district court' ruling on a motion for summary judgment is reviewed de novo. See, e.g., *Moss v. Harris County Constable Precinct One*, 851 F.3d 413, 417 (5th Cir. 2017) (citing *Feist v. La., Dep't of Justice, Office of the Attorney Gen*., 730 F.3d 450, 452 (5th Cir. 2013)). The court's role is not to weigh the evidence when deciding a motion for summary judgment, but to determine if there is a material fact in dispute. Generally, a trial court deciding whether to grant a motion for summary judgment must view the facts in the light most favorable to the non-moving party, drawing any reasonable inferences in that party's favor. The trial court, therefore, must view the facts in the light most favorable to the party opposing the motion for summary judgment if there exists a genuine dispute regarding those facts.

## III. ARGUMENT AND AUTHORITIES

The ADA states that "no covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms conditions, and privileges of employment." 42 U.S.C. § 12112(a). A prima facia case under the ADA requires a plaintiff to prove (1) that he has a disability; (2) that he was qualified for the job; and (3) that he was subject to an adverse employment decision on account of his disability. *Moss v. Harris County Constable Precinct One*, 851 F.3d 413, 417 (5th Cir. 2017) (citing *LHC Grp*., 773 F.3d at 697). Once a prima facia case is made, "the burden shifts to the employer to 'articulate a legitimate, nondiscriminatory reason for' the adverse employment action." *Delaval v. PTech Drilling Tubulars LLC*, 824 F.3d 476, 479 (5th Cir. 2016) (citing *LHC Grp*. 773 F.3d at 694). If an employer can meet its burden, the plaintiff must then show the employer's explanation is "pretextual." *Id.* (citing *LHC Grp*. 773 F.3d at 694).

Under the ADA, an employer must make a "reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability." *Moss*, 851 F.3d at 417 (citing *Delaval*, 824 F.3d at 481).

### 1. Mr. Pietsch is "disabled" under the ADA.

Mr. Pietsch suffers from mitral valve prolapse. In its COVID-19 Policy-Vaccination Job Requirement Policy related to COVID-19, Defendant updated its "job requirements to require vaccination, with a qualified COVID-19 vaccine…." [9] However, the policy allowed for the employee to complete a Request for Medical Exemption/Accommodation Related to the Vaccine.[10] On December 15, 2021, Mr. Pietsch timely submitted his request for a medical

---

[9] Ex. A
[10] Id.

exemption.[11] The Request for Accommodation: Medical Exemption from Vaccination consisted of two sections. Mr. Pietsch completed section 1 which was required to be completed by the employee.[12] Section 2 of the form was to be completed by a medical provider. In this case, Dr. Mary Bowden, a physician who has treated over 6,000 Covid patients completed the Request for Accommodation: Medical Exemption from Vaccination, section 2.[13] Dr. Bowden certified "that Dakota Pietsch has a medical condition that prohibited the administration of a COVID-19 vaccination."[14] Dr. Bowden also provided her signature, address, and phone number to Defendant.[15] Defendant never followed up with Dr. Bowden.

On December 16, 2021, Defendant indicated via email that it had "reviewed and approved" Mr. Pietsch's "request for a medical exemption from vaccination" and would "engage in the interactive process to determine a reasonable accommodation."[16] The email further indicated that Mr. Pietsch would "not be able to remain in…[his]] current position…."[17]

Based on Mr. Pietsch's medical condition/disability, Defendant granted his request for a medical exemption from the COVID shot. It did not ask for any additional information related to the request. Had it had questions regarding the request and/or his underlying medical condition/disability, Mr. Pietsch would have answered or provided any additional information Defendant may have needed. If it had concerns regarding Dr. Bowden's certification and/or qualifications, Mr. Pietsch would have allowed Defendant to speak with her or provide any information Defendant may have needed.

---

[11] Ex. B
[12] Id.
[13] Id. and Ex. D
[14] Ex. B
[15] Id.
[16] Ex. C
[17] Id.

4

By granting the request, Defendant admits through its actions that Mr. Pietsch suffered from a disability under the ADA. Now, Defendant want this Court to reconsider its own actions. If Defendant believed there was "no medical evidence to support" Mr. Pietsch's medical exemption as it relates to his heart condition, it would have denied Mr. Pietsch's request for a medical exemption or requested additional information related to his condition. Instead, it granted the request, admitting that Mr. Pietsch had a "disability" under the ADA. Defendant now seeks to relitigate this issue in an effort to avoid liability for its illegal conduct.

### 2. Mr. Pietsch's heart condition is a disability under the ADA as it relates to the COVID shot.

On December 13, 2021, Dr. Mary Bowden completed Mr. Pietsch's Medical Provider Statement, certifying that Mr. Pietsch "has a medical condition that prohibits the administration of a COVID-19 vaccination."[18] Dr. Bowden is an "expert in management and treatment of the [COVID] infection…[and] assessing the risks/benefit profile of the Covid shots."[19] Dr. Bowden testified, "This is about the Covid shot, which I am definitely experienced in and an expert in."[20] Dr. Bowden has treated over 6,000 Covid patients, where a "large portion of those patients were vaccinated…."[21] After treating over 6,000 Covid patients, Dr. Bowden testified that a pattern had "become[] quite obvious."[22] Prior to seeing Dr. Bowden, Mr. Pietsch went to a cardiologist who "couldn't really give [] [him] and answer…" as to whether he should take the COVID shot given his heart condition.[23] The cardiologist told Mr. Pietsch, "he really didn't know if the

---

[18] Ex. B
[19] Ex. D at p. 125
[20] Id. at p. 128
[21] Id. at p. 122.
[22] Id. at p. 123
[23] Ex. E

5

COVID-19 shot would affect his heart condition."[24] Due to his inability to answer the question regarding the impact the COVID shot would have on his heart condition, Mr. Pietsch sought the assistance of a physician with experience related to the COVID shot and its impact on a person with his condition.

Based on her expertise as it relates to the COVID shot, Mr. Pietsch reached out to Dr. Bowden to determine whether he should take the COVID shot given his heart condition, mitral valve prolapse.[25]  According to Dr. Bowden, mitral valve prolapse is dangerous because it can "lead[] to severe mitral valve—mitral regurgitation leaking valve."[26]  Mr. Pietsch was thirty one (31) years old at the time he saw Dr. Bowden.[27]  Dr. Bowden further testified that "based on the CDC's own website that the Covid shot has a statistically higher risk of causing myocarditis in young males, especially Dakota Pietsch.  He fits into that category.  So if he were to get the shot, he would have a statistically significant increased risk of myocarditis based on the CDC's own data."[28]  Dr. Bowden then testified that the risk of his mitral valve prolapse getting worse is higher "if he were to get the Covid shot than he would be if he were to get Covid."[29]  She further testified, "I believe the that if he got treatment for Covid, the risk would be essentially 0 of him having cardiac issues following a Covid infection.  Whereas if he were to get the Covid shot, based on the CDC's own data, he has a statistically significant higher risk of having myocarditis."[30]  Mr. Pietsch has a "physical impairment" under the ADA.

### 3. Mr. Pietsch's has a qualifying disability under the ADA.

---

[24] Ex. F
[25] Ex. E at p. 151
[26] Ex. D at p. 154.
[27] Ex. F
[28] Ex. D at p. 163
[29] Id. at p. 164.
[30] Id.

Assuming, arguendo, this Court requires Mr. Pietsch to relitigate the disability issue, Mr. Pietsch's medical condition, as described above, is a disability under the ADA.

42 U.S.C. § 12102 defines "disability" as:

(1) Disability. The term "disability" means, with respect to an individual—

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual.

Although the ADA does not define "substantially limits" or "major life activities," the regulations promulgated by the EEOC "provide significant guidance." *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 727 (5th Cir. 1995). The EEOC regulations state that "[m]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(i)(1)(i) (emphasis added)For the major life activity of "working," the EEOC regulations provide:

> The term "substantially limits" means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

*Bridges v. City of Bossier*, 95-30756, 92 F.3d 329 (5th Cir. 1996).

Mr. Pietsch has a heart condition, mitral valve prolapse. According to the Mayo Clinic, "mitral valve prolapse is a type of heart valve disease that affects the valve between the left heart chambers."[31] It has been public knowledge since the introduction of the mRNA (messenger RNA) drugs that Pfizer, Moderna, and Jannsen formulated, and for which they were each given

---

[31] Mayoclinic.org/diseases-conditions/mitral-valve-prolapse

Emergency Use Authorizations, introduce a code (i.e., a message, hence messenger) into the body telling the body itself to produce the SARS-CoV-2 spike protein wrapped in a lipid nanoparticle.

According to Merriam-Webster's Dictionary, "impairment" means a "diminishment or loss of function or ability."[32] Mitral valve prolapse is dangerous because it can "lead[] to severe mitral valve—mitral regurgitation leaking valve."[33] Dr. Bowden testified that "based on the CDC's own website that the Covid shot has a statistically higher risk of causing myocarditis in young males, especially Dakota Pietsch. He fits into that category. So if he were to get the shot, he would have a statistically significant increased risk of myocarditis based on the CDC's own data."[34] Dr. Bowden then testified that the risk of his mitral valve prolapse getting worse is higher "if Mr. Pietsch were to get the Covid shot than he would be if he were to get Covid."[35] She further testified that "I believe the that if he got treatment for Covid, the risk would be essentially 0 of him having cardiac issues following a Covid infection. Whereas if he were to get the Covid shot, based on the CDC's own data, he has a statistically significant higher risk of having myocarditis." Thus, Mr. Pietsch has a "physical impairment." But how does that physical impairment "substantially limit one or more major life activities of such individual?" Critically, 42 U.S.C. §12102 requires that we focus on the major life activities "of the individual," i.e., Mr. Pietsch. What "major life activity" of Mr. Pietsch is "substantially limited"? Mr. Pietsch's major life activity of "working" has been "substantially limited" when he alleged: Because of his heart condition, he is unable to work in his field, and thus is disabled from, any occupation and with any employer that requires its employees to receive the COVID shot.

---

[32] https://www.merriam-webster.com/dictionary/impairment
[33] Ex. D at p. 154.
[34] Ex. D at p. 163
[35] Ex. D at p.164

Taking the disability argument to its extreme for purposes of illustration, if one assumes that because of the pandemic every single job in the country required one of these injections, and one further assumes that Mr. Pietsch is physically unable to take one of these shots based on his doctor's advice, then, in that situation, Mr. Pietsch would be completely and totally disabled because there would be no job he could perform as he cannot take one of the shots, and thus he would be entitled to a reasonable accommodation.

Limiting the focus back to Mr. Pietsch's position with Defendant, the result is the same – Mr. Pietsch's physical condition substantially impairs his ability to "work" for Defendant because Defendant has a job requirement of taking the COVID shot. As a result, he would be legally entitled to a reasonable accommodation.

By way of further illustration and analogy, assume a company instituted a mandatory job requirement that every employee must participate in a 1-mile-per-day walk to promote corporate wellness. What would happen to the people who physically cannot walk? They are now suddenly disabled from any position within that company because they physically cannot perform the new job requirements and thus should be provided with a reasonable accommodation. That situation is no different from the case at bar. The introduction of a new job requirement suddenly caused a previously able worker to be disabled from that same position and the worker should be afforded a reasonable accommodation. Anticipating the argument that the COVID shots were mandated to protect everyone else, rather than just the employee, while a 1-mile walk is only to protect the individual, that argument cannot stand because after August 2021, when CDC Director Rochelle Walensky announced on cable news that the "vaccinated" can catch and spread (i.e., become infected with SARS-CoV-2 and transmit it to others) and that the only benefit of the so-called vaccines was that they allegedly lessened symptoms, it became clear that receiving one of the

shots could only possibly protect the individual from more severe symptoms. Defendant's deadline that Plaintiff receive an EUA injection was after August 2021, which was after the CDC admitted that the vaccinated can catch and spread the virus. Therefore, while Mr. Pietsch's disability may derive from an inability to take certain medications, the actual disability is an inability to engage in "working" any job that requires the COVID shot. Thus, Mr. Pietsch has a disability, i.e., a physical impairment that substantially limits the major life activity of working in jobs that require the COVID shot.

### 4. Defendant failed to provide Mr. Pietsch a reasonable accommodation.

After granting Mr. Pietsch's request for a medical exemption, he was placed on leave and not allowed to work. As part of the "interactive process," Mr. Pietsch was considered for three positions. Frac Flowback Supervisor, high bay and low bay tech, and machinist.[36]

a. **Frac Flowback Supervisor**: Mr. Pietsch was interviewed for the frac flowback supervisor position.[37] The frac flow back supervisor position required Mr. Pietsch to move his family almost ten (10) hours away, Odessa, Texas, and paid substantially less than what he was making as a TSP-3 for Defendant.[38] In order to earn the same income Mr. Pietsch was earning before the vaccine mandate, Mr. Pietsch would have had to work 150 overtime hours every 2 weeks. During his interview for the position, Mr. Pietsch was told that because he did not know anything about fracking, he would have to take a pay cut and would be required to pay for his housing in Odessa, Texas.[39]

b. **High bay and/or low bay tech:** The high bay and/or low bay position would

---

[36] Ex. E at p. 173 and Ex. F
[37] Ex. F
[38] Ex. F
[39] Ex. F

10

require Mr. Pietsch to drive three hours every day to get to work and a $100,000 pay cut.[40]

    c. **Machinist:** The machinist position was only three days a week. The job was located in Stephensville, Texas, over five hours away from where Mr. Pietsch and his family live.[41] Additionally, the machinist position paid over $100,000 less than Mr. Pietsch was making at the time the Defendant implemented its COVID policy.[42]

Defendant failed to provide any other opportunities when it knew positions existed that Mr. Pietsch qualified for and paid approximately the same he was paid pre-COVID 19.[43] In fact, after discussing the three (3) positions, and because Mr. Pietsch didn't take the positions, Defendant stopped communicating with Mr. Pietsch.[44]

> **5. Many positions were available that Mr. Pietsch was qualified for and did not require the employee to be vaccinated. Defendant refused to send Mr. Pietsch to these jobs while allowing other unvaccinated employees to take the jobs.**

Mr. Pietsch's supervisor, Sidney Bouse testified: "[A]fter Mr. Pietsch was granted a medical exemption, I worked with the Human Resources department to provide Mr. Pietsch with a reasonable accommodation that would have allowed him to work. I identified jobs Mr. Pietsch was qualified for where a COVID-19 vaccination was not required. I brought these jobs to the attention of the Human Resource Manager, Amanda Simmons. Ms. Simmons refused to even consider Mr. Pietsch for any of the jobs. When I brought the fact that these jobs did not require COVID-19 vaccination and that Mr. Pietsch was qualified for the jobs, Ms. Simmons indicated that she was absolutely not sending him to the jobs."[45] During this same time period, the Human

---

[40] Ex. E at p. 174 and Ex. F
[41] Ex. F
[42] Id.
[43] Ex. E at p. 175 and Ex. G
[44] Ex. E at p. 176
[45] Ex. G

Resource Manager, Ms. Simmons, was sending unvaccinated employees to jobs Mr. Pietsch was qualified for. Specifically, Mr. Bouse testified, "While she [Ms. Simmons] was not allowing Mr. Pietsch to be sent on jobs, Ms. Simmons was not stopping other unvaccinated TFMC employees from going on jobs Mr. Pietsch was qualified for."[46] Mr. Pietsch's supervisor testified that he believes "TFMC [Defendant] failed to provide a reasonable accommodation for Mr. Pietsch. As a result, he was required to leave TFMC."[47]

### 6. Defendant made an "adverse employment decision" against Mr. Pietsch because of his disability.

After refusing to take the COVID shot, Mr. Pietsch's was not allowed to work and his compensation was cut substantially. He went from making approximately $14,400 a month to approximately $4,600 a month.[48] This was a substantial pay cut that resulted in Mr. Pietsch having to end his employment with the Defendant and seek employment elsewhere.

## IV. CONCLUSION

Mr. Pietsch respectfully requests that the Court deny FMC Technologies, Inc.'s Motion for Summary Judgment.

Dated: July 19, 2024                    Respectfully submitted,

                                         /s/ Jared R. Woodfill
Jared R. Woodfill
State Bar No. 00788715
WOODFILL LAW FIRM, P.C.
3 Riverway, Suite 750
Houston, Texas 77056
713.751.3080 (Telephone)
713.751.3058 (Fax)
woodfillservice@gmail.com

---

[46] Ex. G
[47] Ex. G
[48] Ex. F

ATTORNEY FOR PLAINTIFF

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served on all counsel for all parties of record on July 19, 2024 in accordance with the Federal Rules of Civil Procedure.

  */s/ Jared R. Woodfill*
Jared R. Woodfill
Attorney for Plaintiff